J-A23017-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| J.G., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| A.L. | |
| v. | |
| O.W. | No. 647 WDA 2019 |

Appeal from the Order Entered March 29, 2019
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD 17-009449-010

BEFORE:   BENDER, P.J.E., KUNSELMAN, J. and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                FILED NOVEMBER 8, 2019

J.G. (Paternal "Grandmother") appeals from the March 29, 2019 order awarding A.L. ("Mother") sole legal custody and primary physical custody of Z.P., born in March of 2012, and Q.P., born in January of 2017 (collectively "Children").  Grandmother was awarded partial physical custody of Children and O.W. ("Father"), who was named as a defendant in this matter along with Mother, was ordered to have no contact with Children at the time the order was issued.[1]  After review, we affirm.

_____

[1] Father declined to participate in the proceedings below and has not taken any action with regard to the appeal before the Court.

On December 5, 2017, Grandmother filed the complaint for custody that began this litigation that eventually resulted in two days of trial, held on January 17, 2019, and on March 15, 2019. On March 29, 2019, the court issued its ruling, giving Mother sole legal and primary physical custody of the two Children. The order also provided for Grandmother to have partial physical custody of Children every other Saturday from noon to 4:00 p.m. Although Grandmother could attend school and athletic events and, during her custody time, she could take them to activities in the community, she was prohibited from taking Children to her residence. Additionally, Grandmother was afforded telephone contact with Children. The court also ordered that Father and A.G. ("Paternal Aunt") were to have no contact with Children.

In its opinion, the trial court listed the eight witnesses from whom it heard testimony at trial. The witnesses were:

> [S.P.], half-sibling to Z.P. and Q.P. and granddaughter of [Grandmother]; Roxie Robinson, family friend of Grandmother; Joyce Stoudemire, friend of Grandmother and former minister at Holliday Memorial AME Zion, Braddock PA; Grandmother; Lily VanDyk, LSW and therapist for Three Rivers Adoption Council; [] Child Z.P.; Keri Vanderpool, Casework Supervisor Allegheny County Office of Children Youth and Families (OCYF); and Mother.

Trial Court Opinion (TCO), 5/2/19, at 1. Notably, the trial court's opinion is concise and essentially only provides an overview of its final order and Grandmother's issues raised in this appeal. The court relies on its recitation of the facts in relation to the factors to be considered in awarding custody

pursuant to 23 Pa.C.S. § 5328. The court also relies on its extensive findings

of fact that support its decision, which we reproduce here in pertinent part:

> 6. In addition to [Z.P.] and [Q.P.], Mother has another child, [S.S.], who was born [i]n March [of] 2003. He is 16 years old.
> 7. In addition to [Z.P.] and [Q.P.], Father has another Child, [S.P.], who is a college student and is approximately twenty-one years old.
> 8. [Z.P.] and [Q.P.] reside with … Mother, … and their half-brother[,] [S.S.].
> 9. This case began when eight-year-old [J.S.] was murdered by [Father] on June 20, 2016. [J.S.] died of head injuries caused by inflicted trauma. [J.S.] [was] the son of … [Mother] and the half-sibling of [Z.P.] and [Q.P.].
> 10. [Father], the father of [Z.P.] and [Q.P.], was convicted of first degree murder in the death of [J.S.]. He was sentenced to life without parole. His conviction is being appealed.
> 11. Mother was also charged with Endangering the Welfare of Children for failure to seek prompt medical attention for [J.S.].
> 12. OCYF filed petitions for dependency as to [Z.P.] and his half-sibling [S.S.]. [Both] were adjudicated dependent on August 24, 2016. [Z.P.] was placed in kinship foster care with … [Grandmother]. [Grandmother] cared for [Z.P.] until he was returned to the care of … Mother on August 15, 2017.
> 13. On February 8, 2017, OCYF filed a petition for dependency as to [Q.P.]. The adjudicatory hearing was held on August 4, 2017. The court found that [Q.P.] was not dependent and dismissed the petition. [Q.P.] has resided with … Mother for his entire life.
> 14. On December 5, 2017, after [Z.P.] was returned to Mother's care and before the closure of the dependency case, Grandmother[] filed a complaint for primary physical custody of [] [C]hildren, and alleged that Mother was not providing proper care for her Children.
> 15. [The court] find[s] that Grandmother has standing as a party in the custody action, as her relationship with [] Children began with the consent of Mother and Father; she was willing and able to assume responsibility for [] [C]hildren[;] [] Children had been adjudicated dependent by the [c]ourt and that [] Children were at risk due to parental neglect.
> 16. The [O]CYF case was closed on February 13, 2018. At that hearing[,] the court made the following findings of fact.

- 3 -

a. [Z.P.] was returned to the care of ... [M]other on August 15, 2017.

b. Mother is meeting all of his needs.

c. [Z.P.] wishes to remain with ... Mother. He does not want to have visitation with ... paternal [G]randmother or ... [P]aternal [A]unt because they are mean to his Mother.

d. [Z.P.] says that "he can visit ... [G]randmother (if ordered) but not in her home".

e. Father was convicted of 1st degree murder for the death of [Z.P.'s] half-sibling. Prior to the trial, paternal [G]randmother was pressuring [Z.P.] about the case.

f. Mother states (and others have confirmed) that paternal aunt is "stalking her[."]

g. Mother attempted to get a PFA against the aunt, but the aunt is not a family or intimate party who can be a defendant in a PFA proceeding.

h. Mother did obtain a PFA on behalf of the children against Father.

i. Paternal [G]randmother has filed a complaint for custody. She is alleging [] Mother is not meeting the needs of the Children. OCYF has investigated and KidsVoice has been in the home. Neither has concerns for [] Child's safety in Mother's care[;] both are recommending case closure.

j. Mother has a confidential address and is asking to move to another county. The custody trial is scheduled for April 19, 2018.

17. Since case closure, both Children have remained in the care of Mother.

18. On April 20, 2018, the court entered an interim custody order, which specified that Mother should maintain primary physical custody and legal custody of the children. The court awarded partial physical custody of [Q.P.] every other Saturday from 10:00 A.M. until 11:30 A.M. at the Wilkinsburg Library [to Grandmother].

19. The court also ordered for Grandmother to begin supervised partial custody with [Z.P.] through the Family Reconnections program at Three Rivers Adoption Council (TRAC). TRAC was to recommend a duration and frequency for Grandmother's partial custody.

20. Grandmother was also ordered to schedule a meeting with George White, [Z.P.'s] therapist from Wesley Spectrum, and to engage in therapeutic sessions with [Z.P.] and Mr. White until the supervised visitation with TRAC was in place.

21. The custody [trial] was continued until June 21, 2018.

22. Mother was less than cooperative with the sessions with George White. On June 21, 2018, [the court] ordered the following:

> a. Mother shall attend her intake appointment at Three Rivers Adoption Council (TRAC).
>
> b. Mother shall ensure that the child, [Z.P.], attends all scheduled therapeutic visitations at TRAC with Paternal Grandmother.
>
> c. Mother shall encourage [Z.P.] to attend all visitations with Paternal Grandmother.
>
> d. Mother shall refrain from making inappropriate statements to [Z.P.] about [] [C]hild's father (i.e. [,] paternity).
>
> e. Paternal Grandmother and Mother shall communicate in a respectful manner using email. The parties shall exchange email addresses.
>
> f. The parties shall consult the therapist at TRAC as to whether it is appropriate for Paternal Grandmother to bring gifts for [Z.P.] to the visitation and if appropriate, what types of gifts are appropriate. A judicial conciliation was scheduled for August 30, 2018. See Order of Court filed and of record.

23. Mother's non-compliance with [the court's] order continued. Per letter of George White on August 29, 2018, no reunification sessions with Grandmother and [Z.P.] occurred due to Mother['s] cancelling the sessions.

24. On August 30, 2018, after conciliation[,] no agreement was reached. A one-day custody trial was scheduled for January 17, 2019. [The court] also ordered for Grandmother to have partial custody of [] Children every other Saturday from noon until 1:30 P.M. at a location as agreed upon by the parties. If the parties cannot agree upon a location, then Grandmother's partial custody time shall occur at the Wilkinsburg Library. Paternal Grandmother shall not bring other persons to her partial custody time with [] Children. See Order of Court dated August 30, 2018, filed and of record.

25. The custody trial began on January 17, 2019 as scheduled. The trial could not be completed in one day and a second day was held on March 15, 2019. ...

26. Father was present by telephone for the first day of the trial, but declined to attend the second day of the trial. He stated that he would like [] Children to be placed with [Grandmother].

27. [S.P.] is the 18-year old half-sister of [Z.P.] and [Q.P.]. She is a freshman at California University of Pennsylvania. She testified that when [Z.P.] lived with ... Father ... and [Mother], she visited the[m] every weekend and in the summer. She testified that [Mother] was more of a "friend to her and to [S.S.,"] [Mother's] now 16-year old son.

28. [S.P.] testified that [S.S.] smokes marijuana and that she saw gang[-]related photos on his phone (drugs and guns). She testified that [S.S.] was rough with the other [C]hildren. She also stated that [] Children's hygiene was poor (not clean or bathed, not brushing teeth, etc.)[.]

29. [S.P.] described ... Grandmother as very loving and stated that Grandmother helped her through a lot of situations. She testified that the last time she saw [Z.P.] and [Q.P.] was in August of 2018, when [Mother] brought them to her job. She would like to have more contact with her siblings.

30. Roxie Robinson is a family friend of Grandmother and her family. She is also acquainted with Mother having known her since April 2017. Ms. Robinson resides in a home owned by Grandmother with the paternal aunt, [A.G.].

31. Roxie Robinson described Mother as a "distant parent who did not seem concerned about the well-being of her children (feeding, bathing, etc.).["] She testified that Mother frequently used profanity and inappropriate language [and] that she yelled a lot and at times was intoxicated. [The court] did not assign much weight to this testimony as [the court] felt Ms. Robinson was unduly harsh on Mother and failed to assign any responsibility to Father.

32. Joyce Stoudemire is a friend of Grandmother and former member of Holiday Memorial AME Zion Church. Reverend Stoudemire testified that she has observed [] Children with Grandmother in Grandmother's home and at church. She is acquainted with Mother through Grandmother and Father. She described Grandmother as a loving disciplinarian. She stated that [] Children were comfortable with Grandmother.

33. Reverend Stoudemire described Mother as loving but senses a "laxness" in parenting when [G]randmother and the paternal family were around.

34. Lily VanDyk is a therapist for Three Rivers Adoption Council (TRAC). She was assigned to provide therapeutic family sessions with Grandmother and [Z.P.]

35. Ms. VanDyk observed that Grandmother was consistently warm and affectionate with [Z.P.] Grandmother gave appropriate praise to [Z.P.]

36. [Z.P.] reciprocated engagement. He greeted Grandmother with affection.

37. Grandmother did not bring up the death of [J.S.] or anything relating to this topic. She used age-appropriate language and maintained clear boundaries.

38. On December 17, 2018, Grandmother brought [S.P.] to the visit to sit in the waiting area. Mother became upset by this.

39. Ms. VanDyk recommended for Grandmother to receive unsupervised visitation with [Z.P.], and that prior to visitation becoming unsupervised, the parties engage in conflict resolutions services.

40. Keri Vanderpool is a casework supervisor for Allegheny County OCYF. Ms. Vanderpool testified that after the dependency case was closed in February of 2018, the agency received another referral for Mother. In October of 2018, the agency received a report that [S.S.] was abusing [Z.P.]. The agency found that [Z.P.] seemed happy in the home and there was no evidence that [] Child was being abused. The case was closed on December 6, 2018.

41. The agency also received a referral concerning truancy for [Z.P.]. He ha[d] 26 absences for the 2018-2019 school year. Mother told the caseworker and she also testified that she had kept [Z.P.] out of school because the Paternal Aunt was stalking [Z.P.].

42. Each time that OCYF staff was in Mother's home they found no safety concerns. The home was clean, there was sufficient food, and all utilities were working. Mother appeared to be affectionate with [] Children and in the words of Ms. Vanderpool, "the family is bonded."

43. [Z.P.] testified that he wants to live with … Mother and his brothers. At this time he would like to continue to visit … [G]randmother. It should be noted that [Z.P.] is very articulate. He has a good vocabulary and it is obvious that he is being appropriately engaged.

44. Paternal Grandmother testified that she believes that [Mother] is not providing appropriate care for her Children. She testified that [] Children were often dirty and unkempt. Grandmother introduced photographs showing what she believed were burns on

[Z.P.'s] finger and foot and on [Q.P.'s] arm; a photograph showing [Q.P.'s] dirty legs; and a series of photographs showing feces in [Q.P.'s] car seat, a dirty playpen, the dry and scaly condition of [Q.P.'s] skin and scalp, and [S.S.] smoking.

45. Grandmother also testified that she feels that she can take better care of [] Children and that she is there to help Mother. She also testified that in 2016-2017, Mother and Father worked a night shift and that she often kept [] Children at night.

46. Grandmother also expressed concern for sixteen-year-old [S.S.'s] behaviors and the affect that this may have on her grandchildren. Grandmother states that [S.S.] smokes marijuana and is involved in gang[-]related activity. Grandmother introduced photographs that show [S.S.] smoking, holding guns and making "gang signs" with his friends.

47. Grandmother also recounted an incident where [S.S.] broke into her daughter's home resulting in [his] being adjudicated delinquent and going to placement.

48. [S.S.] also stole a gun from a friend of Mother and took it to school in a back pack.

49. There is currently a high-level of distrust and antagonism between Mother and Paternal Grandmother. Both Mother and Grandmother introduced emails that demonstrated this.

50. Grandmother has a highly stable lifestyle. She is gainfully employed at Highmark as a tech assistant, earning about $65,000 per year. She has resided in the same home and community for many years.

51. Grandmother is surrounded by family members who love and respect her.

52. Mother testified that she is also concerned about [S.S.'s] behaviors but stated that [S.S.] has a positive relationship with his younger brothers. She was concerned that [S.S.'s] behaviors may have contributed to his getting shot. Mother is planning to relocate to a safer neighborhood.

53. Mother does not have the same level of housing and lifestyle stability as [G]randmother. Mother has moved several times. Her latest planned move will cause a school change for [Z.P.]

54. Mother has no support other than her advocates at the Women's Center and Shelter.

55. Mother loves her Children. They are still grieving from the death of [J.S.]

56. Mother does not oppose [] Children having contact or visitation with Grandmother. She is not willing, however, for [] [C]hildren to have contact with Father at this time. Mother believes that it is not the right time to explain to [] Children about

the circumstances of their Father's incarceration, a decision with which [the court] concur[s].

57. Mother does not want [] Children to have visitation in Grandmother's home as the [P]aternal Aunt, [A.G.,] lives on the same street. Mother does not want [] Children to have contact with [P]aternal [A]unt, as she is genuinely afraid of [] Aunt. Mother introduced Facebook postings from [] [A]unt, which are very intimidating and threatening. [The court] concur[s] with Mother's judgment in this regard.

58. [The court] find[s] that both Mother and Grandmother love [] Children and genuinely have their best interests at heart. Both can provide adequate care for the Children.

59. Without a doubt, Grandmother's lifestyle is more stable than Mother's. She has the financial resources to provide [] Children with activities, opportunities and experiences to stimulate their minds and provide enjoyment.

60. [The court] also find[s] that Children would benefit from a continued relationship with their Grandmother who loves them and is concerned for their well-being.

61. While [the court] do[es] have some concerns about the behavior of sixteen-year-old [S.S.], [its] concerns are not so compelling to rule that Mother should not retain primary custody of ... Children.

62. Mother is meeting the needs of ... Children. There is no credible evidence that [] Children are being or have been abused or neglected.

63. Although Grandmother can provide ... Children with more "things" and more "opportunities" and a better living environment, [the court] ha[s] no serious concerns for the safety or well-being of [] Children in the care of Mother: The dependency case was successfully closed with [] Children having been returned to the care of ... Mother. OCYF has been inside of Mother's home on several occasions since case closure and saw no concerns for ... Children's safety.

. . .

65. In this case, [the court] find[s] that Mother is adequately caring for ... Children. Accordingly, in the absence of abuse or neglect, [the court] find[s] that Mother's right to custody of ... Children is superior to Grandmother's right to custody of ... Children.

Trial Court's Finding of Facts ("FOF"), 4/29/19 (citations to the parties' exhibits contained in the record omitted).

Grandmother appealed and now raises the following nine issues for our review:

1. The [t]rial [c]ourt abused its discretion and committed an error of law by only awarding [P]aternal Grandmother very limited partial physical custody and legal custody of the subject Children in effect by failing to objectively analyze and properly weigh the sixteen (16) factors listed in 23 Pa.C.S.[] § 5328(a).

2. The [t]rial [c]ourt abused its discretion by entering a custody order which on its face appears to punish Paternal Grandmother for the mere filing of her custody complaint as evidenced by the [t]rial [c]ourt's analysis of factors 8 and 13 as outlined in 23 Pa.C.S.[] § 5328(a).

3. The [t]rial [c]ourt abused its discretion by not properly considering the risk of harm that [] [C]hildren's half-brother poses to them, given his drug use, gang involvement, and criminal activity.

4. The [t]rial [c]ourt abused its discretion by not considering and properly weighing Mother's alienation of [] [C]hildren from Paternal Grandmother and her family, which was clearly demonstrated by the evidence presented in the case.

5. The [t]rial [c]ourt abused its discretion by taking into consideration Z.P.'s wishes given the child's young age and lack of sound or well-reasoned judgement.

6. The [t]rial [c]ourt abused its discretion by finding that Mother is able to attend to the daily physical, emotional, and developmental, educational, and special needs of [] [C]hildren when the evidence presented at the trial clearly contradicts such a finding.

7. The [t]rial [c]ourt abused its discretion by allowing the submission of Mother's Exhibit D, "Facebook posts from Paternal Aunt directed towards Defendant [Mother]" over the

- 10 -

objection of Paternal Grandmother's counsel due to lack of foundation and improper authentication.

8. The [t]rial [c]ourt abused its discretion in ordering that Paternal Grandmother is not permitted to exercise custody of [] [C]hildren at her home when there was no evidence that Paternal Grandmother or any members of Paternal Grandmother's household pose any risk of harm to [] [C]hildren.

9. The [t]rial [c]ourt abused its discretion by not assigning weight to the testimony of Roxie Robinson, not because the [t]rial [c]ourt did not find the testimony to be credible, but merely because Roxie Robinson did not assign any responsible [sic] to [] [C]hildren's Father and because the [t]rial [c]ourt felt that Roxie Robinson was unduly harsh in her criticism of Mother, and without looking at the facts to which Roxie Robinson testified too [sic].

Grandmother's brief at 6-8.

When presented with child custody matters, we are guided by the following scope and standard of review:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

E.D. v. M.P., 33 A.3d 73, 76 (Pa. Super. 2011) (quoting A.D. v. M.A.B., 989 A.2d 32, 35-36 (Pa. Super. 2010)). Furthermore, we note that:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

> Ketterer v. Seifert, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting Jackson v. Beck, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

A.H. v. C.M., 58 A.3d 823, 825 (Pa. Super. 2012).

The primary concern in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being. Saintz v. Rinker, 902 A.2d 509, 512 (Pa. Super. 2006) (citing Arnold v. Arnold, 847 A.2d 674, 677 (Pa. Super. 2004)). Furthermore, we recognize that the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340, governs all proceedings commenced after January 24, 2011. The specific factors that a court must consider are listed at 23 Pa.C.S. § 5328(a)(1)–(16). See E.D., 33 A.3d at 79-80 (holding that "best interests of the child" analysis requires consideration of all section 5328(a) factors).

Moreover, in a matter dealing with custody litigation between a parent and a third party, we are further guided by the provisions in 23 Pa.C.S. § 5327(b). Section 5327(b) provides:

(b) Between a parent and third party.—In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence.

In V.B. v. J.E.B., 55 A.3d 1193 (Pa. Super. 2012), this Court discussed

this principle, noting initially that,

where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

Id. at 1199 (quoting Charles v. Stehlik, 744 A.2d 1255, 1258 (Pa. 2000)

(internal quotations and brackets omitted)). The V.B. court further instructed

that:

What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

McDonel v. Sohn, 762 A.2d 1101, 1107 (Pa. Super. 2000) (quoting Ellerbe v. Hooks, 490 Pa. 363, 416 A.2d 512, 513-514 (Pa. 1980)). In Ellerbe, supra [416 A.2d] at 514, our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents."

V.B., 55 A.3d at 1199.

In her first claim of error, Grandmother sets forth the factors listed in 23 Pa.C.S. § 5328(a) and identifies the facts that she believes the court erroneously failed to consider. Initially, we recognize that section 5328(a) directs that "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child[.]" Therefore, in light of Grandmother's argument, we provide the trial court's responses to each of the 16 factors, as follows:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

There is currently distrust and antagonism between Mother and Paternal Grandmother. Without an order of court, it is doubtful that either party would encourage and permit frequent and continuing contact between [] Children and the other parties. Father is currently serving a life-sentence for killing the half-sibling of [] Children. Mother is not willing for contact to occur at this time, a decision with which [the court] concur[s].

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

Father is currently serving a life-sentence for killing the half-sibling of [] Children. [Z.P.] was present in the home when this occurred. There is no evidence [] Mother or Grandmother has committed abuse.

(3) The parental duties performed by each party on behalf of the child.

- 14 -

Mother currently performs all parental duties on behalf of [] Children.

(4)   The need for stability and continuity in the child's education, family life and community life.

Father is currently serving a life-sentence for killing the half-sibling of [] Children. Mother has a history of moving around, resulting in changing schools and community. Mother plans another move in the near future. Without a doubt, Grandmother could provide a more stable living environment. She has resided in the same home and community for many years. Several family members reside in the same community.

(5)   The availability of extended family.

Father and Grandmother have a lot of extended family to assist in the care of [] [C]hildren, if needed. Mother does not have extended family to assist her.

(6)   The child's sibling relationships.

[] Children have a close sibling bond with their half-brother, [S.S.]

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

[Q.P.] is too young to state or have an opinion. [Z.P.] would like to continue living with his Mother and have some visitation with his Grandmother.

(8)   The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

Despite the fact that Father is currently serving a life-sentence for killing the half-sibling of [] Children, there is no evidence that Mother has attempted to turn the [C]hildren against him. Mother is also willing for [] Children to have reasonable contact with Paternal Grandmother. The filing of this complaint for custody by

Grandmother and her assertion that Mother is not a fit parent, in and of itself demonstrates an attempt to turn [] Children against their Mother.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

Both Mother and Grandmother are able to do this and would continue to do this if either was the primary custodian. Father, due to his incarceration, is unable to do this at this time.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Both Mother and Grandmother are able to do this and would continue to do this if either was the primary custodian. Father, due to his incarceration, is unable to do this at this time.

(11) The proximity of the residences of the parties.

Mother and Grandmother, at this time, are in reasonable proximity to one another.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

Both Mother and Grandmother are able to do this and would continue to do this if either was the primary custodian. Father, due to his incarceration, is unable to do this at this time.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

There is currently a high-level of distrust and antagonism between Mother and Paternal Grandmother. Without an order of court, it is doubtful that either party would

encourage and permit frequent and continuing contact between [] Children and the other parties. Father is currently serving a life-sentence for killing the half-sibling of [] Children. Mother is not willing for contact to occur at this time, a decision with which [the court] concur[s].

(14) The history of drug or alcohol abuse of a party or member of a party's household.

There was evidence presented that the half-sibling of [] Children smokes marijuana.

(15) The mental and physical condition of a party or member of a party's household.

Both Mother and Grandmother appear to possess sufficient mental and physical stability that would enable them to adequately parent [] Children.

(16) Any other relevant factor.

There is a high level of conflict between [M]other and the [P]aternal [A]unt who resides in close proximity. Mother is not willing for the Aunt to have contact with her Children (which is her right). Mother is concerned that if the Children are visiting in the home of Grandmother, that contact will occur. Mother appears to have a real fear of the Aunt to the point where she attempted to file a Petition for Protection from Abuse.

Trial Court's Responses to Section 5328(a) Custody Factors, 4/2/19.

With regard to Factor (1), Grandmother asserts that the trial court failed to consider her care of Z.P. for almost a year when Mother was considered unable by OCYF and her caring for Mother and Q.P. after Father's arrest. Grandmother also claims that the record contains no evidence to support a finding that she would not facilitate contact between Mother and Children if

they were in her care. Thus, Grandmother contends that this factor should weigh in her favor.

As to Grandmother's claim that Factor (2) should weigh in her favor, she relates that J.S. was murdered while under Mother's care and that Mother was found guilty of endangering the welfare of children, receiving a sentence of two years' probation. Grandmother also relies on her own testimony centering on actions by S.S. in that he physically and sexually abused J.S. (deceased child) and Z.P., facts that she claims the trial court did not mention. She also cites the court's discounting of Roxie Robinson's testimony, not because Ms. Robinson was not found credible, but due to Ms. Robinson's failure to blame Father for the actions he took. See FOF at Nos. 30-31. Grandmother also points out that no member of her household is a risk to Children.

Although Grandmother acknowledges with regard to Factor (3) that Mother performs the parental duties for Children, she contends that the court did not consider the manner and level at which Mother did perform those duties. Grandmother notes Z.P.'s numerous unexcused absences from school and the drop in his grades since his return to Mother's care and Mother's failure to see to Children's regular medical care. Grandmother emphasizes her testimony about her care of Children and especially her care of Z.P. solely from 2016 to 2017.

Even though the court found Factor (4) in Grandmother's favor, Grandmother asserts that it should have weighed heavily in her favor in light

of the stability of her life, i.e., living in same home for 35 years, married for 25 years, and having the same job for 26 years. Comparing these facts to Mother's stability, Grandmother identifies Mother's moving often causing the changing of schools for Z.P. and his drop in grades. As for Factor (5), Grandmother has extended family in the area, while Mother has no extended family in the area.

In addressing Factor (6), Grandmother takes issue with the court's weighing S.S., Z.P. and Q.P.'s relationships as a factor in Mother's favor. Instead, Grandmother contends that the court erred in not consider Children's relationship with S.P., their half-sister on the paternal side of the family, who would be a positive influence in Children's lives, unlike the influence that S.S. has on the two younger Children. As for a child's preference listed as Factor (7), Grandmother argues that the court did not consider Z.P.'s age, six years old, or his failure to give any compelling reasons for preferring to live with Mother. Grandmother also quotes some of Z.P.'s responses to the court's questions, claiming that it was obvious that he was coached.

The court, in finding that Factor (8) weighed against Grandmother, relied on the fact that because Grandmother had filed the custody complaint she was attempting to turn Children against Mother. However, Grandmother asserts that no evidence was presented showing that Grandmother had spoken negatively about Mother or in any way attempted to alienate Children

from Mother. Rather, Grandmother contends that she initiated this action due to her concern for the welfare of Children.

Although the court found Factors (9) and (10) were essentially neutral, Grandmother cites her witnesses' testimony about Mother's behavior toward Children, identifying it as borderline verbally and physically abusive. Grandmother also cites Mother's testimony about not recalling when she last took Children for a checkup, that she does not tuck Children into bed at night, and that despite the fact that Children need counseling, she has failed to set up appointments for them. Additionally, Grandmother relies on her own evidence about Children's lack of hygiene when they are in Mother's care.

Factors (11) and (12) are not in contention; however, in discussing Factor (13) the court found a high level of distrust and antagonism between Mother and Grandmother, which would limit any encouragement to permit frequent and continuing contact between Children and either party. Grandmother again cites the court's reference to her filing of the custody complaint which created conflict between the parties. Grandmother also contends that the record reveals how rigid Mother is when Grandmother is attempting to exercise her partial custody rights.

In connection with Factor (14), Grandmother's assertion references S.S.'s actions, his gang affiliations and his smoking of marijuana, which she contends poses a risk of harm to Children. As to Factor (15), Grandmother identifies Mother's admission that she required mental health treatment, a fact

that the trial court did not consider. At the same time, Grandmother counters that nothing in the record reveals that she has any mental or physical condition that negates her ability to care for Children. As to the final factor, Factor (16) relates to the high level of conflict between Mother and Paternal Aunt so that the court ordered Aunt to have no contact with Children. In this regard, Grandmother recognizes that Mother and Paternal Aunt do not get along; however, Grandmother asserts that the record contains no evidence that Paternal Aunt poses a risk of harm to Children.

This extensive discussion of the section 5328(a) custody factors presented to us by Grandmother is essentially taking issue with the trial court's credibility determinations and its decisions about the weight it afforded the testimony and evidence from the various witnesses it heard from during the two-day trial. We are compelled to "determine whether the trial court's incontrovertible factual findings support its factual conclusions, but [we] may not interfere with those conclusions unless they are unreasonable in view of the trial court's findings and are, therefore, an abuse of discretion." K.B. II v. C.B.F., 833 A.2d 767, 770 (Pa. Super. 2003). Moreover, in light of the credibility determinations formulated by the trial court, which are supported by the record, we cannot and will not re-find and/or reweigh the evidence. See C.R.F., III v. S.E.F., 45 A.3d 441, 443 (Pa. Super. 2012) (stating that our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include

making independent factual determinations"). Taking into consideration the entire record, we conclude that the trial court did not abuse its discretion by concluding that Grandmother had not rebutted the presumption of custody in favor of Mother. Accordingly, we conclude that Grandmother's first issue does not afford her any relief.

In her second issue, based upon the trial court's responses to Factors (8) and (13), Grandmother claims that the court appears to punish Grandmother simply because she filed the custody complaint and asserted that Mother was not a fit parent. In other words, Grandmother contends that the court erroneously concluded that the filing of the complaint was evidence that Grandmother was attempting to create a conflict between Mother and Children. Grandmother points out that by utilizing this reasoning, these factors could weigh against any plaintiff who files a custody action. Moreover, Grandmother claims that hostilities between the parties are only relevant if they are a threat to Children or their welfare and that nothing in the record evinces that Grandmother has perpetrated such animosity.

In response, Mother relies on statements in Grandmother's complaint and various other documents that Grandmother was requesting sole legal custody and either sole, or at a minimum, primary physical custody with Mother only being granted partial physical custody as Grandmother would agree. Mother also relies on documentation and testimony in the record that supports the court's finding as to the level of conflict between Mother and

Grandmother. Mother further responds that Grandmother has not supported her argument with anything in the record that shows that the court placed more weight on these two factors. We agree and do not conclude that the trial court abused its discretion by commenting on what it determined was the basis for Grandmother's request for sole physical and legal custody. Throughout the record there is evidence of the high-level of conflict between the parties, whether or not Grandmother was attempting to turn Children away from Mother by filing the custody complaint.

Grandmother's third issue centers on Children's half-brother, S.S., and his gang involvement and his drug use, which was testified to by Grandmother. She also notes Mother's admission that S.S. uses drugs and has twice stolen guns. Grandmother contends that the trial court disregarded the testimony about S.S., even though S.S.'s actions could have an impact on the well-being of Children. Mother responds by pointing to evidence from OCYF and KidsVoice in the dependency action that eventually resulted in the closure of the dependency action. Further, Mother notes that by June 2018 no more safety concerns were evident. We reiterate that we must accept the court's credibility determinations that are supported by the record and we cannot reweigh the evidence. See C.R.F., III, supra. Therefore, we are compelled to conclude that this issue does not provide relief to Grandmother in that the court's findings and conclusions are supported by evidence of record.

In Grandmother's fourth argument, she contends that the court abused its discretion by not properly considering and weighing Mother's actions that caused the alienation between Children and Grandmother. Essentially, Grandmother bases this error by the court on its failure to consider Grandmother's care of Z.P. for almost a year from 2016 to 2017, during which time Mother had contact with Z.P. on a daily bases. Grandmother also mentions her care of Mother and Q.P. after Father's arrest. Despite these actions by Grandmother, she claims that Mother cut off all contact and was not cooperative in scheduling visits with George White and setting up TRAC, which would have aided in resuming interaction between Z.P. and Grandmother, allowing for her periods of custody. Essentially, Mother's response to this issue identifies evidence about her concern for Children's well-being, yet notes that Grandmother provided evidence in her favor. Again, the determination as to this issue rests on the court's credibility decisions and the weight it applied to the evidence presented. We must defer to the trial court and do not conclude that its decision here was unreasonable in keeping with the sustainable findings of fact.

Grandmother's next issue concerns the court's consideration of Z.P.'s stated preference to live with Mother.[2] In her brief, Grandmother cites responses Z.P. gave when questioned by the trial judge, asserting that "it

_____

[2] At the time of trial, Q.P. was too young to testify and state his preference.

became obvious that someone ha[d] likely discussed the ongoing custody proceeding with him." Grandmother's brief at 54. Although the court found this factor weighed in Mother's favor, Grandmother contends this was in error because Z.P. did not provide any compelling reasons for this preference and was only six years old at the time.

"One of the factors a trial court must consider when making any award of custody is '[t]he well-reasoned preference of the child, based on the child's maturity and judgement.' 23 Pa.C.S. § 5328(a)(7)." E.B. v. D.B., 209 A.3d 451, 468 (Pa. Super. 2019). "The weight to be accorded a child's preference varies with the age, maturity and intelligence of that child, together with the reasons given to the preference. Moreover, as children grow older, more weight must be given to the preference of the child." Id. (quoting B.C.S. v. J.A.S., 994 A.2d 600, 604 (Pa. Super. 2010)).

As noted in its findings of fact, the court recognized Z.P.'s stated preference to live with his Mother and brothers and to visit with Grandmother. The court also found that Z.P. was articulate, had a good vocabulary, and that "he [was] being appropriately engaged." FOF at No. 43. However, our review reveals nothing in the court's findings, its responses to the list of factors, or in either its opinion or statements on the record at the end of the trial, that it put much emphasis on the preference factor. Rather, we conclude that the court's finding and conclusion as to Z.P.'s preference, which is supported by

the evidence, is not unreasonable.  Therefore, we conclude again that this issue does not merit any relief.

Grandmother next argues that the trial court abused its discretion by finding that based upon the evidence of record Mother is able to properly care for Children on a daily basis.  Grandmother mentions Z.P.'s drop in his grades at school, Mother's failure to keep up with Children's medical care, and though acknowledging Children's need for counseling, no follow-through with this need has been addressed by Mother.  Grandmother also cites Mother's inability to provide good hygiene for Children.  Thus, Grandmother asserts that Mother does not provide for the daily physical, emotional, developmental, and educational needs of Children.

Mother's response centers on this Court's scope and standard of review, citing Hanson v. Hanson, 878 A.2d 127 (Pa. Super. 2005).  Specifically, in awarding a father primary physical custody, the Hanson decision provides that

> [i]t is not our function to determine whether the trial court reached the "right" conclusion, or whether [the father]] sustained his … burden of proof.  Rather, we consider whether, based on the evidence presented and giving due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion in determining that it is in the children's best interest for [the father] to have primary physical custody.

Id. at 129.

Mother then discusses the testimony from the OCYF's caseworker relating to a home visit in October of 2018.  The testimony indicated that

Children were clean and neat and that the home had food and working utilities. As for a visit in March of 2019, which occurred due to Z.P.'s truancy, the caseworker testified that food was available and the home had working utilities, that Mother's interaction with Children was appropriate, that Z.P.'s grades were either satisfactory or needed improvement, and that Z.P. was scheduled to complete first grade. The caseworker found no safety issues and no concerns about Mother's care of Children. Mother also provides an extensive discussion about her care of Children and the bond she has with them. Again, Grandmother has not provided a basis upon which we can overturn the trial court's conclusion. Although there is evidence to support both parties' claims, there is no basis to overturn the trial court's reasonable decision.

Grandmother next argues that the trial court abused its discretion by admitting Mother's Exhibit D, purportedly a printout of Paternal Aunt's Facebook page, without a foundation and proper authentication. The reason Mother wished to admit the exhibit was her belief that the printouts were threatening to her. Additionally, Mother identified the printouts as belonging to Paternal Aunt because they had previously been friends, pictures on the posts were of Paternal Aunt, and the posts also contained her name.

Grandmother overlooks this Court's recognition that "the admission or exclusion of evidence is within the sound discretion of the trial court." Blumer v. Ford Motor Co., 20 A.3d 1222, 1226 (Pa. Super. 2011). "In reviewing a

challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." Id. Moreover, our review of the transcript from the March 15, 2019 trial shows that when Grandmother's attorney objected to the admission of the printouts, contending that Mother should have subpoenaed Paternal Aunt to authenticate them, the trial court responded, stating:

> THE COURT: Well, I mean, just as you admitted the photographs with S.S., you know, you could have called S.S. So she had indicated that she had previously been friends with her on Facebook. Her photograph is on here. So I'm going to allow them. Objection overruled.

N.T., 3/15/19, at 279.

The court's reference to the admission of the photographs of S.S., holding a gun and smoking, that were admitted over objection, were not authenticated by the person who took them. However, in support of their admission, Grandmother contended that the pictures were available on the internet and that she could identify S.S. as the individual in the photographs. Therefore, the court allowed their admission. The court ruled that this was akin to Mother's identification of Paternal Aunt's pictures on the printout of Paternal Aunt's Facebook page and allowed that admission as well. Because it is apparent that in both situations, the witnesses, S.S. and Paternal Aunt, who could have authenticated the exhibits, were available to testify, we conclude that the court did not abuse its discretion by admitting the exhibits

and, therefore, Grandmother's argument relating to the admission of Mother's Exhibit D is without merit.

Grandmother's next issue concerns her allegation that the court abused its discretion by ordering that she was not permitted to have Children at her home in that no member of her household poses any harm. Rather, she contends that because she is only permitted to spend time with Children in public places, an undue burden on her was created. Grandmother acknowledges that the trial court set this limitation because Paternal Aunt lives across the street. However, Grandmother testified that Paternal Aunt would not be in contact with her or Children when they would be in her custody.

In response, Mother relies on facts gleaned from her own testimony and emphasizes her concern as to the safety of Children. She further relies on K.B. II, wherein this Court with reliance on Troxel v. Granville, 530 U.S. 57 (2000), indicated that "the United States Supreme Court cautioned that if a fit parent's decision regarding his or her child 'becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.'" K.B. II, 833 A.2d at 776 (quoting Troxel, 530 U.S. at 70).

The trial court in announcing its decision at the end of the trial made particular note of this concept, stating:

> And while I would say that due to [G]randmother's stability, financial resources, yes, she could provide probably a nicer home and nicer things and more resources for [] [C]hildren, but that's not the standard by which the [c]ourt should judge a custody case when one of the parties is not a parent.

It has been widely recognized by the courts, including, the United States Supreme Court, that there is a fundamental right of parents to make decisions concerning the care, custody, and control of their children.

So as long as a parent adequately cares for his or her children -- and that's the operative term, "adequate care," doesn't have to be the best care -- there is no reason for the state to inject itself into the private realm of the family to further question the ability of the parent to make the best decisions concerning the rearing of the parents' children.

So absent proof of abuse or neglect or emotional harm, the rights of the parent trump the rights of a grandparent. Their rights are superior over the right of any other person seeking custody of a child.

N.T., 3/29/19, at 357-58. We rely on the trial court's reasoning and conclude this argument provides Grandmother with no relief.

In her last issue, Grandmother contends that the trial court abused its discretion by not assigning the proper weight to Roxie Robinson's testimony. See FOF at Nos. 30 and 31. Although Grandmother's brief describes numerous facts about which Ms. Robinson testified with citations to the notes of testimony, she overlooks this Court's limitation relating to the weight and credibility determinations made by the trial court. As to both, we defer to the trial court who observed the proceedings and the demeanor of the witnesses. See A.V. v. S.T., 87 A.3d 818, 820 (Pa. Super. 2014). Thus, Grandmother's final issue is without merit.

For the reasons stated above, we conclude that Grandmother's issues are devoid of merit and, therefore, we affirm the trial court's custody order.[3]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2019

_____

[3] Although some of the discussions, relating to the issues Grandmother has raised in her brief, were not accompanied by citations to the record or supported by authority, a fact that is contrary to Pa.R.A.P. 2119(b), we have been able to discern the thrust of Grandmother's arguments and have therefore chosen to respond to the issues and have not found waiver.